Neil S. SPRUILL, Administrator of the Estate of Marion William Spruill, Jr., Deceased, Appellee,

v.

BOYLE-MIDWAY, INCORPORATED, a foreign corporation, and American Home Products Corporation, a foreign corporation, Appellants.

No. 8589.

United States Court of Appeals Fourth Circuit.

Argued June 1, 1962.

Decided Sept. 8, 1962.

Edwin J. Rafal and Frederick T. Stant, Jr., Norfolk, Va. (Parsons, Stant & Parsons, Norfolk, Va., on brief), for appellants.

Arnold H. Leon, Portsmouth, Va. (Stanley J. Bangel, and Bangel, Bangel & Bangel, Portsmouth, Va., on brief), for appellee.

Before SOPER and BELL, Circuit Judges, and BARKSDALE, District Judge.

## J. SPENCER BELL, Circuit Judge.

This is an appeal by the defendants, Boyle-Midway, Incorporated, and American Home Products Corporation, from a judgment of the District Court for the Eastern District of Virginia entered upon a jury verdict for the plaintiffs in a wrongful death action. The defendants having preserved their rights by proper motions throughout the trial now ask us to set aside the judgment and rule that the case ought properly not to have gone to the jury; or that if it was properly submitted to the jury that the evidence in the case does not support the verdict.

The defendants are manufacturers and distributors of a product identified as "Old English Red Oil Furniture Polish". The plaintiffs in the court below were the parents and siblings of a fourteen months old infant who died as a result of chemical pneumonia caused by the ingestion of a small quantity of the defendants' product.

The mother of the deceased stated that she had purchased the polish on the morning of November 13, 1959, and later in the day was using it in her home to polish furniture. While using it in the deceased's bedroom she noticed a catalog which her mother had asked to see. While still in the course of polishing the furniture, she left the room and took the catalog next door to her mother's home. She testified that she was out of the room for four or five minutes.

At the time she left the room the deceased was in his crib in one corner of the room which was near one end of a

bureau. The child could reach the end of the bureau nearest the crib but could not reach articles beyond the very edge of the bureau. The mother placed the polish, prior to leaving the room, upon the end of the bureau that was out of the child's reach. When she returned she found that the child had pulled a cover-cloth which was on the bureau into the crib, and the bottles and other articles sitting on the cloth came into the crib with it. The child had removed the cap of the bottle and had consumed a small portion of the polish.

The child was admitted to a hospital that same day, and according to the testimony of Dr. Barclay ultimately died on November 15th from hydrocarbon pneumonia. This particular type of pneumonia is a form of chemical pneumonia which usually results from the ingestion or inhalation of a petroleum distillate.

Old English Red Oil Furniture Polish is a liquid of a bright cherry red color contained in a clear glass bottle which is about 6¾″ tall and 2¼″ in diameter. The bottle has a red metal cap. The evidence shows that there are one and one-half to two threads upon the neck of the bottle and the cap.

The ingredients of Old English Red Oil Furniture Polish are 98.2% mineral seal oil, 1.8% cedar oil, a trace of turpentine, and oil soluble red dye. Chemical analysis of the product states: "This preparation consists almost entirely of [a] petroleum distillate which is somewhat heavier than kerosene and commonly designated as Mineral Seal Oil, or 300 degree oil, as it distills near 300 degrees C."

The label consists of a piece of paper of deep red hue which passes completely around the bottle at its center. On the front part of the label appear the words "Old English Brand Red Oil Furniture Polish" in large letters; beneath this in small letters "An all purpose polish for furniture, woodwork, pianos, floors". The reverse side of the label, the background of which is white, contains the following printed matter: at the top in red letters about ⅛th of an inch in height, all in capitals, "CAUTION COMBUSTIBLE MIXTURE". Immediately beneath this in red letters 1/16th of an inch high "Do not use near fire or flame"; several lines down, again in letters 1/16th of an inch in height, in brown ink, all in capitals, the word "DIRECTIONS"; then follow seven lines of directions printed in brown ink in letters about 1/32nd of an inch in height. On the eighth line in letters 1/16th of an inch high in brown ink appear the words "Safety Note"; following this in letters approximately 1/32nd of an inch in height:

"Contains refined petroleum distillates. May be harmful if swallowed, especially by children."

Following this is the name of the manufacturer and various other information with which we are not here concerned.

There was testimony that mineral seal oil is a toxic substance, and that it is a petroleum distillate. The defendants' expert chemists testified that one teaspoonful of this product would kill a small child. There was uncontroverted evidence of several doctors that the child died of hydrocarbon pneumonia resulting from the ingestion of the defendants' polish. Dr. Julius Caplan, one of the doctors treating the deceased, attributed death to the nature of the polish, and stated that because of its toxic quality it was capable of penetrating the intestinal tract, thus getting into the blood stream and thereby setting up fatal lung damage. Dr. James Morgan, another treating physician, testified that this polish contained a hydrocarbon that was toxic and that such resulted in the death of the child.

The mother testified that she had no knowledge that the defendants' product would have caused injury or death to her child. She stated that she had read the statement at the top of the label in large colored letters "Caution Combustible", but did not read the directions because she knew how to use furniture polish.

At the trial the plaintiffs were allowed to put into evidence certain interrogatories they had served upon the defend-

ants together with the defendants' answers and admissions which showed that the defendants had knowledge or notice of at least thirty-two cases of chemical pneumonia since 1953 resulting from the ingestion of this product. Ten of these thirty-two cases resulted in death. At least seven of these thirty-two cases were infants; four of these infants died as a result of chemical pneumonia. The defendants vigorously objected to the admission of this testimony, and on this appeal assigned its admission as error.

The jury in returning its verdict excluded the mother from sharing in any part of the judgment. The defendants made no request for a special verdict; therefore, the jury returned a general verdict. It was in favor of the plaintiffs other than the child's mother.

■ The issues raised by this case are: (1) Whether the case ought properly not to have gone to the jury because the injury to the deceased was, as a matter of law, unforeseeable to the defendants since ingestion of the polish was not within its "intended use"; (2) Whether the evidence of prior accidents, to show knowledge on the part of the defendants that it was being consumed by humans, was improperly admitted since there was no showing that the circumstances of these prior accidents were similar to those of the present one; (3) Whether the negligence of the mother was the sole proximate cause of decedent's death. Since jurisdiction is here founded on diversity, we are bound by the substantive law of Virginia.

The defendants here have at no time raised the issue of lack of privity between themselves and the deceased and it appears that the point is conceded. In any event it is apparent that this case comes within the exception to the doctrine of Winterbottom v. Wright, 10 Mees & W. 109, 152 Eng.Reprint 402 (1842) which is made for inherently dangerous products. There can be no doubt but that this exception to that doctrine is well established in Virginia. General Bronze Corp. v. Kostopulos, 203 Va. 66, 122 S.E.2d 548 (1961); Norfolk Coca-Cola Bottling Works v. Krausse, 162 Va. 107, 173 S.E. 497 (1934); Robey v. Richmond Coca-Cola Bottling Works, 192 Va. 192, 64 S.E.2d 723 (1951). Indeed it is significant to note that the product involved in the leading case of Thomas v. Winchester, 6 N.Y. 397, 57 Am.Dec. 455 (1852), which firmly established the exception made for inherently dangerous products, was a poison.

■■ Within the last year the courts of Virginia held that the test of whether a product is inherently dangerous is whether, "the danger of injury stems from the product itself, and not from any defect in it." General Bronze Corp. v. Kostopulos, supra. We hold that the danger of injury from the product stems from the product itself and not from any defect arising out of, or resulting from, negligence in the course of manufacture. It is therefore, an inherently dangerous product.

■ The defendants have contended throughout that they are liable only for injuries caused in the course of the intended use of their product. Since their product was not intended to be consumed, they say, there is no liability for death or injury resulting from consumption of it. We agree with the general principle but the application the defendants would have us make of it here is much too narrow. "Intended use" is but a convenient adaptation of the basic test of "reasonable foreseeability" framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. "Intended use" is not an inflexible formula to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

However, he must also be expected to anticipate the environment which is normal for the use of his product and where, as here, that environment is the home, he must anticipate the reasonably foresee-

able risks of the use of his product in such an environment. These are risks which are inherent in the proper use for which his product is manufactured. Thus where such a product is an inherently dangerous one, and its danger is not obvious to the average housewife from the appearance of the product itself, the manufacturer has an obligation to anticipate reasonably foreseeable risks and to warn of them, though such risks may be incidental to the actual use for which the product was intended. As the courts of Virginia have stated it,

> "The common law requires a higher degree of care and vigilance in dealing with a dangerous agency than is required in the ordinary affairs of life and business which involve small risk of injury." American Oil Co. v. Nicholas, 156 Va. 1, 157 S.E. 754, 757 (1931). See also Standard Oil Co. v. Wakefield, 102 Va. 824, 47 S.E. 830, 66 L.R.A. 792 (1904).

We have no doubt but that under the circumstances of its use the courts of Virginia would regard Old English Red Oil Furniture Polish as a dangerous agency. A very small quantity of it is lethal to children and extremely dangerous to adults, yet the product gives no indication by its appearance of its life endangering capacity. It appears as harmless as a bottle of soft drink, yet this product is sent daily into thousands of homes in which dwell persons incompetent to safely judge its capacity for harm. It goes there without any reasonable indication from its natural character of its death dealing power if improperly used. It would be quite reasonable to anticipate that in the process of using it for its intended purpose it would be placed in close proximity to children. *They* certainly cannot be expected to recognize it as a lethal poison. Under these circumstances we think that a reasonable jury could properly find that it was foreseeable that sooner or later some child would draw the fatal draught.

Placing primary reliance upon Hentschel v. Baby Bathinette Corp., 215 F.2d 102 (2 Cir. 1954), and Boyd v. Frenchee Chemical Corp., 37 F.Supp. 306 (E.D. N.Y.1941), the defendants have argued that they are liable only for injuries inflicted within the "intended use" of the product in its narrowest sense. Were this contention to be accepted it would mean that the manufacturer's liability for failure to adequately warn users would be restricted to injuries done to furniture to which the polish is applied and to injuries done in the course of the application to the person applying it. So narrow a rule of liability cannot be supported under Virginia law,

> "At common law the liability of a manufacturer for failure to adequately warn of the dangers *incident to the use of his product* does not depend on whether the injury is to the person using the product, or to the person or object to which the product is to be applied, *or to persons or things other than those to which the product is to be applied."* (Emphasis added). McClanahan v. California Spray-Chemical Corp., 194 Va. 842, 75 S.E.2d 712, 719 (1953).

This is a proper statement, we think, of the common law rule and properly takes into account that "intended use" is merely a convenient measure of "reasonable foreseeability of harm". The narrow application of the rule of "intended use" in Hentschel and Boyd fails to recognize this fact and to make due allowance for it in the application of the rule. In this sense they represent a departure from the common law and one which the courts of Virginia manifestly have not accepted in the case of inherently dangerous products.

We believe both of these cases to be unsound in point of legal principle. The majority in Hentschel rely upon the fact that the product was not inherently dangerous within its normal intended use. But as Judge Frank points out, it was made to go into homes and reasonable men could differ as to whether it was foreseeable that in some of these homes there would be fires. Once there was

a fire the product became, without question, an agency of great danger. Reasonable men could find it foreseeable that these fires would occur, as in Hentschel, when the product was in the home in the course of normal intended use. Thus we think the rationale of the majority is fatally afflicted with a legalistic myopia. For noteworthy critiques of this case see, 41 Va.L.Rev. 145, 165, and 71 Yale L.J. 816, 862–63.

The Boyd case is even weaker authority than Hentschel for it does not hold on the question of a manufacturer's *common law duty*. There dry-cleaning fluid was drunk by an infant, with fatal results. Plaintiff contended that the product was improperly labelled under the Pennsylvania Economic Poison Act, Act of May 17, 1917, P.L. 208, Act No. 119, § 17, 35 P.S.Pa. § 901. The court held that the product was not within the terms of the Act and that the complaint did not state a cause of action thereunder. Plaintiff then contended that the complaint stated a cause of action under the common law. On this the Court said,

> "That contention is not in accord with my reading of the complaint in the action at bar, which it seems obvious to me is drawn on the theory that the defendant may be shown to have been negligent in that it failed to label the product 'Hollywood Fabric Cleaner' as 'Poison' under the Pennsylvania Law, Act of May 17, 1917, P.L. Act No. 119, Page 208." Boyd v. Frenchee Chemical Corp., supra (37 F.Supp. at 309).

Though the Court went on to consider the sufficiency of the allegation in the complaint under the common law, such consideration was not necessary to a resolution of the case and all statements made in the course thereof are pure obiter dicta. The case could at most be persuasive for us. This it is not, for it arose under Pennsylvania law and, in addition is afflicted with the same misconception of the common law rule of "intended use" as is Hentschel.

■■ However, even though a reasonable manufacturer should have foreseen that the product would have been consumed by humans, that manufacturer may not be liable if it has adequately warned of the danger to be reasonably foreseen. But a mere indication of danger, in and of itself, does not accomplish an inevitable tergiversation of liability. If warning of the danger is given and this warning is of a character reasonably calculated to bring home to the reasonably prudent person the nature and extent of the danger, it is sufficient to shift the risk of harm from the manufacturer to the user. To be of such character the warning must embody two characteristics: first, it must be in such form that it could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use; secondly, the content of the warning must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.

The only protection available to children living in homes where this product is used is the caution of their parents, who are incapable of recognizing this harmless looking product for the dangerous agency it is. Without additional warning these adults have not the knowledge to invoke their caution on behalf of their young.

Under such circumstances as these the Virginia Courts have imposed upon the manufacturer or seller of the product a duty to warn of the danger.

> "A person who knowingly sells or furnishes an article which, by reason of defective construction *or otherwise*, is eminently dangerous to life or property, *without notice or warning of the defect or danger*, is liable to third persons who suffer therefrom." (Emphasis added). McClanahan v. California Spray-Chemical Corp., supra; quoting with approval, 3 Cooley, Torts, § 498 at 467 (4th ed., 1932).

Where one is under a duty to warn another of danger and he fails to perform this duty by giving adequate warning,

he is liable to the person to whom the duty is owed for injuries he suffers due to ignorance of the danger. Low Moore Iron Co. v. La Bianca, 106 Va. 83, 55 S.E. 532 (1906). The sufficiency of the warning is to be judged on the basis of the nature of the danger, and the degree of care required is "commensurate with the risk therefrom reasonably to be foreseen". Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664 (1951).

■ The duty to call attention to the danger is properly on defendant under the Virginia law. Moreover the question of the sufficiency of the warning is normally for the jury. McClanahan v. California Spray-Chemical Corp., supra; American Oil Co. v. Nicholas, supra; C. F. Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 (1945) quoted with approval in McClanahan, supra. See generally Dillard and Hart, "Product Liability: Directions For Use And The Duty To Warn", 41 Va.L.Rev. 145, 177–78 (1955).

■ Under the law of Virginia a jury question is presented whenever reasonable men might properly draw different conclusions from the evidence, or if the conclusion properly to be drawn depends upon the weight to be given to the evidence. Adams v. Allen, 202 Va. 941, 121 S.E.2d 364 (1961); Carrington v. Ficklin's Ex'r, 32 Grat. (73 Va.) 670 (1880). A question may be taken from the jury and decided by the court only where a single conclusion or inference may be drawn from the evidence. Nehi Bottling Company v. Lambert, 196 Va. 949, 955, 86 S.E.2d 156, 159 (1955).

■ Keeping in mind the nature of the danger as described above we think reasonable men could properly differ as to the sufficiency of the notice here given, and that the finding of insufficiency of notice made by the jury in this case is amply supported by the evidence. The notice here given was not printed on the label in such a manner as to assure that a user's attention would be attracted thereto. Indeed, we think one might reasonably conclude that it was placed so as to conceal it from all but the most cautious users. It is located in the midst of a body of print of the same size and color, with nothing to attract special attention to it except the words "Safety Note".

Further, even if the user should happen to discover the warning it states only "contains refined petroleum distillates. May be harmful if swallowed especially by children". The first sentence could hardly be taken to convey any conception of the dangerous character of this product to the average user. The second sentence could be taken to indicate to the average person that harm is not certain but merely possible. The expert medical evidence in this case shows that "harm" will not be contingent but rather inevitable, to young and old alike. Moreover, the last phrase of the sentence hardly conveys the thought that a very small quantity of the polish is lethal to children.

There were two elements of danger inherent in this product, first, its character as a lethal poison, and second, its combustibility. We think that a reasonable jury could conclude that the greater danger in the environment of the modern home, and therefore the danger which due caution would require to be given the greater prominence on the label, was its poisonous character. Certainly a reasonable jury could conclude that this danger was required to be given a prominence at least *equal* to that arising from its combustible nature. A jury convinced that the poisonous character of this polish poses the greater danger could reasonably conclude that a manufacturer which hides its warning of the greater danger within its warning of the lesser is indulging its mercantile interests at the expense of the duty of due care it owes to the purchasing public.

■ The defendants contend, however, that,

"The question of the sufficiency of the warning is alleviated by the mother's admission that she never read the label. Not having availed herself of the information contained

on the bottle she cannot be permitted to ask for a more explanatory label."

The short answer to this is that where the manufacturer is obligated to give an adequate warning of danger the giving of an inadequate warning is as complete a violation of its duty as would be the failure to give any warning. In this case had the warning been in a form calculated to attract the user's attention, due to its position, size, and the coloring of its lettering, and had the words used therein been reasonably calculated to convey a conception of the true nature of the danger, this mother might not have left the product in the presence of her child. Indeed, she might not have purchased the product at all, a fact of which the manufacturer appears to be aware. Having deprived the mother of an adequate warning which might have prevented the injury, it cannot be permitted to rely upon a warning which was insufficient to prevent the injury. This is the reasoning behind the rule laid down by the courts of Virginia that, " * * * [A]n insufficient warning is in legal effect no warning". Sadler v. Lynch, 192 Va. 344, 347, 64 S.E.2d 664, 666 (1951); McClanahan v. California Spray-Chemical Corp., supra. The jury in this case could reasonably find that the warning given was insufficient both in form and in content, and did, in fact, so find. The warning being insufficient, defendants cannot be permitted to take aid and comfort from it to any extent.

It is convenient to dispose of defendants' third contention at this point. This is that the mother of the deceased was negligent in the handling of the product and that her negligence is "the sole proximate cause of decedent's death". This was submitted to the jury under the following instruction:

"Now if Linda Marie Spruill was guilty of contributory negligence which proximately caused or proximately contributed to her child's death, the law completely bars her from any right of recovery to participate in any manner. That, of course, would not preclude you, if you thought there should be a recovery, from making a division of some type in some amount as you saw fit between the other parties who were eligible to receive, which would be the father and the two sisters."

The jury returned the following verdict,

"THE CLERK: 'We the jury find for the plaintiff to the sum of $20,-000.00 to be divided as follows: Forty percent for Marion William Spruill; thirty percent for Theresa Anne Spruill; thirty percent for Lenora Pauline Spruill', signed B. G. Ward."

From this we think it clear that the jury found the mother to be negligent in her handling of the product. There is no evidence, however, that the jury thought it was the sole cause of deceased's death. The instruction on proximate cause left this issue open to them if they had wished to so find. Thus the clear import of the jury's verdict is that the defendants were negligent in failing to warn of the inherent danger of the product, that the mother was negligent in handling the product, and that these two acts of negligence concurred to cause the death of the deceased.

The defendants now ask us to say that *as a matter of law* the mother's negligence was an intervening proximate cause of the deceased's death, which insulated its primary negligence. Here again we think a jury question was presented. Adams v. Allen, supra; Carrington v. Ficklin's Ex'r, supra.

 The Virginia Courts have held that the test of an efficient, intervening cause is whether or not the primary actor could reasonably foresee the occurrence of the intervening act. In Standard Oil Co. v. Wakefield, 102 Va. 824, 47 S.E. 830 (1904) the Court adopted the so-called "Massachusetts Rule" as the test that best comports with "common sense and practical justice",

"The act of a third person intervening and contributing a condition necessary to the injurious effect

of the original negligence, will not excuse the first wrongdoer if such act ought to have been foreseen." (At 47 S.E. 833) quoting from Lane v. Atlantic Works, 111 Mass. 136, 139 (1871). See also, Hines v. Garrett, 131 Va. 125, 108 S.E. 690 (1931). This is the test commonly applied in other jurisdictions. Bryant v. Woodlief, 252 N.C. 488, 114 S.E.2d 241, 81 A.L.R.2d 939 (1960); Puffer v. Hub Cigar Store, 140 W.Va. 327, 84 S.E.2d 145 (1954); William v. Grier, 196 Ga. 327, 26 S.E.2d 698 (1943); McDonald v. Central School District, et al., 289 N.Y. 800, 47 N.E.2d 50 (1943), affirming, 264 App.Div. 943, 36 N.Y.S.2d 438 (1942); Locklear v. Southeastern Stages, 193 S.C. 309, 8 S.E.2d 321 (1940); Holler v. Lowery, 175 Md. 149, 200 A. 353 (1938).

■ We think reasonable men might conclude that defendants might reasonably have foreseen that the average adult user, in the absence of proper warning of the death-dealing capacity of this product, might not use the high standard of caution in keeping it out of range of children which could be expected of one fully conversant with the danger. Under the law of Virginia this is a question for the jury upon sufficient evidence. Standard Oil Co. v. Wakefield, supra. We cannot say on the evidence in this case that reasonable men could not differ on whether the mother's negligence should have been anticipated. Thus the matter was properly given to the jury, and we cannot say on this record that they erred in finding the negligence of the defendants to be concurrent with that of the mother.

Lastly we come to the defendants' contention that the Court improperly admitted into evidence their admissions that they had knowledge of thirty-two prior instances in which humans ingested their product and as a result thereof contracted chemical pneumonia, which in ten cases resulted in death. It is claimed that this evidence should not have been admitted because there was no showing that the circumstances of these prior instances were sufficiently similar to those of the present case. We think that in view of the purpose for which this evidence was admitted, sufficient similarity of circumstance was shown.

■ In order to prove their case plaintiffs had to show a duty to warn which the defendants had violated. To do this it was necessary to show that defendants knew, or should have known, that the product was being used, or might be used, in a dangerous manner, that is, that it was, or might be, drunk by humans. To do this plaintiffs might have relied upon the application of the rule of reasonable care under the circumstances to the facts that an innocuous looking deadly poison was coming into the environment of the home and thus into close proximity to children. But the plaintiffs might also try to raise a duty to warn by the additional method of proving that the defendants had *actual knowledge* that the product was subject to misuse, that is, human consumption. Out of a super-abundance of caution counsel for plaintiffs, not content to rest its case on the first ground, chose to buttress it by proof of actual knowledge of the danger by the defendants.

These admissions do no more than show defendants' actual knowledge of thirty-two instances in which their product had been consumed by humans. The only similarity of those instances with the present case required is that the product was drunk by humans and that it caused chemical pneumonia. If the defendants *knew* that their product was being drunk with harmful consequences, they had a duty to warn, whether it was being drunk by adults or children, regardless of the circumstances, for then there is but one answer to the question of foreseeability.

The only problem involved in the question of the admissibility of this evidence is one of relevancy. It has long been established that such evidence is relevant to prove knowledge.

"If a person were charged with having willfully poisoned another,

.and it were a question whether he knew a certain white powder to be poison, evidence would be admissible to show that he knew what the powder was because he had administered it to another person who had died." Rex v. Dosset, 2 C&K, 307 (1846).

The principles of relevancy governing proof of knowledge in criminal cases are equally applicable to civil cases. 2 Wigmore, Evidence § 371, p. 300.

Perceiving no error by the court below, we

Affirm.